## LOCKRIDGE v OAKWOOD HOSPITAL

Docket Nos. 283522 and 284664. Submitted July 14, 2009, at Detroit. Decided August 20, 2009. Approved for publication October 8, 2009, at 9:00 a.m.

Scarlett Y. Lockridge, as the personal representative of the estate of her son, James W. Stone, brought a medical malpractice action in the Wayne Circuit Court against Oakwood Hospital, Oakwood-Annapolis Hospital, Donald R. Schipper, M.D., and Professional Emergency Care, P.C., related to Stone's death from an aortic dissection. The jury returned a verdict in plaintiff's favor, and defendants moved for a new trial or judgment notwithstanding the verdict (JNOV). The court, John H. Gillis, Jr., J., denied the motions and entered a judgment against defendants and an order awarding plaintiff costs, interest, and attorney fees. Defendants separately appealed the judgment and the order awarding costs and attorney fees, and the Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

1. The trial court properly rejected as a basis for JNOV defendants' argument that because of the unforeseeability of Stone's aortic dissection, Schipper as a matter of law owed no duty to diagnose it. When deciding whether a duty exists, the most important factor is a sufficient relationship between the plaintiff and the defendant. In light of the physician-patient relationship between Stone and Schipper, Schipper owed Stone the duty to conform to the standard of care. According to one of plaintiff's expert witnesses, the standard of care applicable to Schipper required him to order a chest x-ray, which he failed to do. That the aortic dissection was not foreseeable did not eliminate Schipper's duty.

2. Defendants additionally contended in their motion that JNOV was proper because plaintiff failed to establish a question of fact regarding proximate causation. Proximate cause normally involves examining the foreseeability of consequences and whether a defendant should be held legally responsible for them. The plaintiff must show that it was foreseeable that the defendant's conduct might create a risk of harm to the victim and that

the result of that conduct and intervening causes were foreseeable. Defendants asserted that the diagnosis of aortic dissection was unforeseeable because the condition occurs extremely rarely in children. Moreover, plaintiff's expert witness testified that Schipper should have ruled out the diagnosis of pneumothorax, and defendants argue that it was not foreseeable that the failure to rule that diagnosis out would result in death from an aortic dissection. The expert also testified, however, that the standard of care mandated a chest x-ray to rule out pneumothorax, which would also have provided diagnostic information regarding the existence of the aortic dissection. Thus, it was foreseeable that Schipper's failure to order an x-ray to rule out the most likely diagnosis would also have resulted in the failure to diagnose an aortic dissection. Accepting defendants' argument would mean that if a physician considered one diagnosis and failed to rule it out, he or she would have no liability if the patient actually had a different and rare disease that would have been revealed by the same diagnostic test. Whether a plaintiff could prove proximate cause would depend entirely on the patient's most likely diagnosis. The legal issue is not whether the patient's actual ailment is foreseeable, but whether the patient's injuries and damages arising from the missed diagnosis qualify as a natural and probable result of the defendant's negligent conduct. A diagnostic process may yield unexpected results, but an unforeseen diagnosis does not relieve a physician from liability if the patient's actual condition would have been diagnosed naturally and probably had the physician complied with the standard of care.

3. Plaintiff's counsel elicited improper testimony regarding an authoritive treatise, in violation of MRE 707, but the error was harmless. The references to the treatise were brief and isolated, and given other properly admitted evidence that Schipper violated the applicable standard of care, defendants' substantial rights were not infringed.

4. The trial court did not abuse its discretion by denying defendants' motion in limine concerning what defendants claimed were theories of liability not found in plaintiff's complaint or by sustaining an objection to the closing argument of defendants' counsel concerning the absence of certain treatises as exhibits.

Affirmed.

NEGLIGENCE — MEDICAL MALPRACTICE — PHYSICIANS' LIABILITY — PROXIMATE CAUSE — FORESEEABILITY — DIAGNOSIS OF PATIENT'S CONDITION.

It is foreseeable that a physician's failure to order a test to rule out the most likely diagnosis would also result in a failure to diagnose

a different, rare condition when the test would have supplied information pertinent to both diagnoses; an unforeseen diagnosis does not relieve a physician from liability if the patient's actual condition would have been diagnosed naturally and probably had the physician complied with the standard of care.

*Charfoos & Christensen, P.C.* (by *David R. Parker* and *David W. Christensen*), for plaintiff.

*Siemion, Huckabay, Bodary, Padilla, Morganti & Bowerman, P.C.* (by *Raymond W. Morganti*), for defendants.

Before: OWENS, P.J., and SERVITTO and GLEICHER, JJ.

PER CURIAM. In these consolidated medical malpractice appeals, defendants, Oakwood Hospital, also known as Oakwood Healthcare, Inc., Oakwood-Annapolis Hospital, Donald R. Schipper, M.D., and Professional Emergency Care, P.C., appeal as of right two orders entered by the trial court: an October 2007 judgment for plaintiff, Scarlett Y. Lockridge, personal representative of the estate of decedent, James W. Stone (Docket No. 283522), and a March 2008 order awarding plaintiff attorney fees and costs (Docket No. 284664). We affirm.

I

This medical malpractice case arises from the death of Stone, plaintiff's 14-year-old son. On February 26, 2004, while walking to the school bus stop, Stone developed chest pain, had difficulty breathing, vomited, and fell to the ground. Plaintiff took him to the Oakwood-Annapolis emergency room, where Dr. Schipper examined the boy. Dr. Schipper concluded that Stone was suffering from anxiety and hyperventilation

and treated him with Valium and Toradol, an analgesic. Stone died in his sleep that evening, and an autopsy revealed an aortic dissection.[1] Plaintiff contended at trial that given Stone's chest pain and related symptoms, the standard of care required that Dr. Schipper order a chest x-ray. Plaintiff's expert witnesses opined that a chest x-ray probably would have revealed the presence of an aortic abnormality, which would have led to further testing, such as a computerized tomography (CT) scan. According to plaintiff's experts, either of those tests would have allowed definitive diagnosis of the aortic dissection, and lifesaving surgery would have followed. Dr. Schipper conceded at trial that an aortic dissection could present with acute chest pain, vomiting, difficulty breathing, and anxiety, but that he "never" considered this diagnosis because he had never heard of an aortic dissection in a pediatric patient.

At the close of proofs, defendants moved for a directed verdict, which the trial court denied. The jury returned a verdict in plaintiff's favor, awarding $150,000 for past damages (pain and suffering and loss of society and companionship) and $150,000 for future loss of society and companionship. Defendants filed motions for a new trial or judgment notwithstanding the verdict (JNOV), which the trial court denied. The trial court entered judgment against defendants in the amount of $300,000, plus taxed costs, interest, and attorney fees.

---

[1] An aortic dissection occurs when the innermost lining of the aorta tears, allowing blood to leak into the wall of the aorta. The pressure of the leaking blood weakens the outermost aortic wall, which may eventually tear. The dissection in Stone's aorta led to a tear that permitted blood to leak into the pericardium, the sac surrounding his heart. The pressure of the blood compressed Stone's heart, prevented it from filling, and rapidly caused his death.

II

Defendants first contend that the trial court should have granted their motion for JNOV because, in light of the unforeseeability of Stone's aortic dissection, as a matter of law Dr. Schipper owed no duty to diagnose it. We review de novo a trial court's ruling on a motion for JNOV. *Sniecinski v Blue Cross & Blue Shield of Michigan*, 469 Mich 124, 131; 666 NW2d 186 (2003). "A motion for . . . JNOV should be granted only if the evidence viewed in [the light most favorable to the nonmoving party] fails to establish a claim as a matter of law." *Id.*

> Whether a defendant owes any duty to a plaintiff to avoid negligent conduct is a question of law for the court to resolve. *Simko v Blake*, 448 Mich 648, 655; 532 NW2d 842 (1995). "In determining whether to impose a duty, this Court evaluates factors such as: the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." *Murdock v Higgins*, 454 Mich 46, 53; 559 NW2d 639 (1997), citing *Buczkowski v McKay*, 441 Mich 96, 100; 490 NW2d 330 (1992). Thus, a duty arises out of the existence of a relationship "between the parties of such a character that social policy justifies" its imposition. Prosser & Keeton, Torts (5th ed), § 56, p 374. See also, *Buczkowski, supra*, 100-101. [*Dyer v Trachtman*, 470 Mich 45, 49; 679 NW2d 311 (2004)].

Although courts examine "the foreseeability and nature of the risk" when deciding whether a duty exists, the most important factor is "a sufficient relationship between the plaintiff and the defendant." *Schultz v Consumers Power Co*, 443 Mich 445, 450; 506 NW2d 175 (1993). Duty in a medical malpractice case arises from the physician-patient relationship. *Hill v Kokosky*, 186 Mich App 300, 302; 463 NW2d 265 (1990); see also *Dyer, supra* at 50 (observing that "the duty of care in a medical malpractice action has its basis in the relationship between the physician and the patient"). " 'Mal-

practice, in its ordinary sense, is the negligent performance by a physician or surgeon of the duties devolved and incumbent upon him on account of his contractual relations with his patient.' " *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411, 423; 684 NW2d 864 (2004), quoting *Delahunt v Finton*, 244 Mich 226, 230; 221 NW 168 (1928).

In light of the physician-patient relationship between Stone and Dr. Schipper, Dr. Schipper owed Stone a duty of reasonable care, which in a medical malpractice case constitutes the duty to conform to the standard of care. *Skeffington v Bradley*, 366 Mich 552, 556; 115 NW2d 303 (1962). One of plaintiff's expert witnesses testified that the standard of care applicable to Dr. Schipper required that he order a chest x-ray and that Dr. Schipper breached the standard of care by failing to do so. Regardless of whether a chest x-ray would have revealed a rare disorder like an aortic dissection, or a more commonplace malady, Dr. Schipper had a duty to conform his conduct to the standard of care. That Stone's aortic dissection was not foreseeable did not eliminate Dr. Schipper's duty to act in a manner consistent with the standard of care. Furthermore, even in a typical negligence case, a "plaintiff need not establish that the mechanism of injury was foreseeable or anticipated in specific detail. It is only necessary that the evidence establishes that *some injury* to the plaintiff was foreseeable or to be anticipated." *Schultz, supra* at 452 n 7 (emphasis added). We conclude that the trial court properly rejected defendants' lack-of-duty argument as a basis for JNOV.

III

Defendants additionally maintain that the trial court erred by denying JNOV because plaintiff failed to

establish a question of fact regarding causation. Defendants insist that Dr. Schipper cannot face liability for neglecting to order a test for a condition, pneumothorax, that the patient did not have.

The plaintiff in a medical malpractice case must prove that the defendant's breach of the applicable standard of care proximately caused the plaintiff's injuries. *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004). Proximate cause is a question for the jury to decide unless reasonable minds could not differ regarding the issue. *Nichols v Dobler*, 253 Mich App 530, 532; 655 NW2d 787 (2002). Proximate cause incorporates two separate elements: (1) cause in fact and (2) legal or proximate cause. *Skinner v Square D Co*, 445 Mich 153, 162-163; 516 NW2d 475 (1994). Defendants do not challenge the presence of cause in fact in this case, that but for Dr. Schipper's negligence in failing to order a chest x-ray, Stone's aortic dissection would have been diagnosed.

Legal or proximate cause normally involves examining the foreseeability of consequences and whether a defendant should be held legally responsible for them. *Id.* at 163. "To establish legal cause, the plaintiff must show that it was foreseeable that the defendant's conduct 'may create a risk of harm to the victim, and . . . [that] the result of that conduct and intervening causes were foreseeable.' " *Weymers v Khera*, 454 Mich 639, 648; 563 NW2d 647 (1997), quoting *Moning v Alfono*, 400 Mich 425, 439; 254 NW2d 759 (1977).

> "It appears that the modern trend of judicial opinion is in favor of eliminating foreseeable consequences as a test of proximate cause, except where an independent, responsible, intervening cause is involved. The view is that once it is determined that a defendant was negligent, he is to be held responsible for injurious consequences of his negligent act or omission which occur naturally and directly, without

reference to whether he anticipated, or reasonably might have foreseen such consequences. . . . There is no need for discussing proximate cause in a case where the negligence of the defendant is not established, but when his negligence has been established, the proximate result and amount of recovery depend upon the evidence of direct sequences, and not upon the defendant's foresight." [*Davis v Thornton*, 384 Mich 138, 147; 180 NW2d 11 (1970), quoting 38 Am Jur, Negligence, §§ 58, pp 709-710.]

"The determination of remoteness . . . should seldom, if ever, be summarily determined." *Davis, supra* at 147.

Defendants insist that because aortic dissections occur with extreme rarity in children, the diagnosis was unforeseeable in this case. Dr. Michael Clark, defendants' emergency medicine expert, testified, in pertinent part:

And I personally had never heard that you could have a dissecting aorta in this pediatric group.

I went back and looked in all our emergency medicine literature. It's just not there. And as you know, I studied for my re-certification boards. It still wasn't there. There is nothing that mentioned dissection in a pediatric age group.

Dr. Brian Schurgin, plaintiff's expert, disagreed. Dr. Schurgin testified that he had heard of a case of aortic dissection in a patient who was less than 21 years old and that the condition was "well-known" in patients with Marfan's syndrome.[2] He continued, "[T]here is a defying [sic] subset of younger patients that this occurs in, specifically people with connective tissue disorder."

---

[2] Marfan's syndrome is "a congenital disorder of connective tissue characterized by abnormal length of the extremities, especially of fingers and toes, . . . cardiovascular abnormalities (commonly dilatation of the ascending aorta), and other deformities." *Dorland's Illustrated Medical Dictionary* (25th ed), p 1523. None of the experts expressed that Stone probably had Marfan's syndrome, despite the fact that he was almost six feet tall at age 14.

Dr. Schurgin opined that regardless of whether a physician knows that a patient has a connective tissue disorder, "it's in your differential diagnosis of anybody who has acute onset of eight over ten chest pain and collapses and has all the symptoms, including this sense of impending doom that was clearly here."

Defendants' argument regarding causation does not address Dr. Schurgin's testimony that an aortic dissection was foreseeable in a patient such as Stone. Instead, defendants suggest that plaintiff failed to establish proximate causation because Dr. Schurgin predicated his standard-of-care opinions on Dr. Schipper's failure to rule out a spontaneous pneumothorax, a condition "unrelated" to an aortic dissection. Defendants reason that it was not foreseeable that the failure to rule out a spontaneous pneumothorax would result in death due to an aortic dissection.

This argument is factually and legally flawed. Factually, it mischaracterizes the testimony given by Dr. Schurgin and the other experts. Dr. Schurgin testified that the standard of care required that the differential diagnosis for a patient such as Stone include spontaneous pneumothorax, pulmonary embolism, heart attack, aortic dissection, or "some kind of congenital or birth anomaly . . . ." "Those would be the ones that would be worrisome that you would need to take action on in the emergency department." According to Dr. Schurgin, the standard of care mandated a chest x-ray to rule out a spontaneous pneumothorax. Given Stone's age, asthma history, and tall and thin body habitus, Dr. Schurgin opined that the most likely diagnosis for him was a spontaneous pneumothorax. But Dr. Schurgin explained that a chest x-ray performed to investigate this possibility would also have provided diagnostic information regarding the existence of an aortic dissection:

And I had always been trained that greater than any [sic] percent of the time when you do a chest x-ray in someone with aortic dissection, you will see an abnormality, primarily along the knob of the aorta, which is that diagram that you had where the aorta was going from ascending to descending. That's called a [sic] "aortic knob."

Typically, you'll see a widening there, often called a widening of the mediastinum, which is the central part of the chest.

There are several other subtle findings that can be seen as well. But I've always been trained that greater than eighty (80%) percent of the time, a chest x-ray will show you an abnormality that would be consistent with aortic dissection.

In light of Dr. Schurgin's testimony, it was foreseeable that Dr. Schipper's failure to order an x-ray to rule out the most likely diagnosis, spontaneous pneumothorax, would also result in a failure to diagnose an aortic dissection because a chest x-ray would have supplied information pertinent to both diagnoses.

Furthermore, all the experts agreed that an aortic problem should have been in Dr. Schipper's differential diagnosis for Stone. In emergency medicine, physicians typically construct a list of possible explanations for a patient's symptoms, referred to as "differential diagnosis." Dr. Clark, defendants' expert, described this process as follows: " 'Differential diagnosis' mainly means given the complaint, coupled with physical examination, including the vital signs, what kind of thought process are you thinking about? What kind of disease entities or injury are you thinking of?" Dr. Clark admitted that a differential diagnosis can change as the examination proceeds and that for Stone the differential diagnosis included "[a]nything from trauma to pulmonary, cardiac, to GI [gastrointestinal], any infectious disease, any of those categories which would effect

[sic] the chest," and anxiety. Another defense expert, Dr. Bruce Janiak, described a differential diagnosis as "a list of potential causes that explain the patient's complaint." Dr. Janiak offered that the differential diagnosis for Stone included "[t]rauma; pulmonary embolism; pneumothorax; pneumonia; tumor; pleural fusion [sic: effusion]; emotional stress; esophageal disease; mediastinitis; gastric reflux; diseases of the great vessels, or the heart . . . ." The "great vessels" include the aorta.

Dr. Schurgin addressed defendants' claim that because aortic dissection is exceedingly rare in children, Dr. Schipper need not have ruled it out, explaining that "there's a systematic evaluation you need to do in every patient to make sure that you exclude rare causes." He offered the following example: "We do EKG's now on everyone over the age of 10 or 15 with chest pain. It's probably equally rare for a 15-year-old to have, or a 14-year-old to have a heart attack, but yet it's a routine test. Why? Because if it's missed, it's catastrophic." That defendants performed an EKG on Stone within minutes of his arrival supports Dr. Schurgin's opinion.

According to defendants' argument, if a physician considered one diagnosis and failed to rule it out, he or she would have no liability if the patient actually had a different and rare disease. In other words, whether a plaintiff proved proximate cause would entirely depend on the patient's most likely diagnosis. If the defendant negligently failed to investigate the patient's most probable condition and the patient actually had an alternative, rare problem, the physician would have no liability. Defendants' theory would signify, for example, that if a physician suspected that a patient had a stroke but failed to order a CT scan, he or she would have no liability if the patient actually had a rare brain tumor

that also would have been revealed by a CT scan. This reasoning is inconsistent with the diagnostic process, which inherently assumes that one test like a chest x-ray or CT scan may reveal information relevant to a variety of different diagnoses. Furthermore, the legal issue is not whether the patient's actual ailment is foreseeable, but whether the patient's injuries and damages arising from the missed diagnosis qualify as a "natural and probable result of" the defendant's negligent conduct. M Civ JI 15.01. The diagnostic process may yield unexpected results, as in this case. But an unforeseen diagnosis does not relieve a physician from liability if the patient's actual condition would have been diagnosed naturally and probably had the physician complied with the standard of care.

We conclude that the trial court properly denied defendants' motion for JNOV premised on their contention that no genuine issue of fact tended to establish that they proximately caused Stone's death.

IV

Defendants next complain that plaintiff's counsel repeatedly violated MRE 707 by reading material from an authoritative treatise to the jury. We review for an abuse of discretion a trial court's decision to admit evidence. *Barnett v Hidalgo*, 478 Mich 151, 158-159; 732 NW2d 472 (2007). An abuse of discretion occurs when the decision results in an outcome falling outside the range of principled outcomes. *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006). "However, when the trial court's decision to admit evidence involves a preliminary question of law, the issue is reviewed de novo . . . ." *Barnett, supra* at 159.

Although we agree with defendants that plaintiff's counsel elicited improper authoritative treatise testi-

mony at trial in violation of MRE 707, we find the impropriety harmless. MRE 707 provides:

> To the extent called to the attention of an expert witness upon cross-examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice, are admissible for impeachment purposes only. If admitted, the statements may be read into evidence but may not be received as exhibits.

As the transcript reflects, defense counsel made only one objection to Dr. Schurgin's testimony regarding the emergency medicine study text. Defense counsel objected to Dr. Schurgin's statement that he viewed the treatise as authoritative.[3] The trial court correctly over-

---

[3] The transcript reflects as follows the only objection by defense counsel:

*Q.* Let's first find out, are there texts that you say are authoritative with respect to this case?

*A.* Yes.

*Q.* And would you tell the jury what text and what portions— what do you rely on as authoritative sources in this case?

*A.* Well, in this case, what I relied on was two versions of the book by Tintinelli, which [sic] called *A Comprehensive Study Guide in Emergency Medicine.*

There is [sic] a Fifth and Sixth Edition that kind of bridge the dates in this case; the Fifth preceding this case, and the Sixth being published right round the time of this case.

And once again, my knowledge of aortic dissection had been greater than eighty percent (80%) of the time you'd see something abnormal on a chest x-ray, that seemed to be challenged by the defense experts.

I actually went to these textbooks—[a]nd in books like this, which are reference books—

ruled this groundless objection because MRE 707 expressly contemplates that a learned treatise may be "established as a reliable authority by the testimony or admission of *the witness or by other expert testimony* or by judicial notice . . . ." (Emphasis added.)

In light of defense counsel's failure to object during the balance of Dr. Schurgin's testimony regarding the emergency medicine text, we review for plain error affecting defendants' substantial rights their claim that plaintiff violated MRE 707. *Hilgendorf v St John Hosp & Med Ctr Corp*, 245 Mich App 670, 700; 630 NW2d 356 (2001); MRE 103(a)(1) and (d). The transcript reveals that plaintiff's counsel did violate MRE 707 by introducing statements from the emergency medicine text through Dr. Schurgin as substantive evidence, specifically references to the text's statistics on the frequency of chest x-ray diagnosis of aortic dissection. However, the transcript does not substantiate defendants' contention that plaintiff's counsel "extensively" or "repeatedly" questioned Dr. Schurgin about the text's contents. Given the relatively brief and isolated nature of the error and the other properly admitted evidence that Dr. Schipper violated the applicable standard of care in this case,[4] we detect no infringement on defendants' substantial rights.

---

[*Defense counsel*]: I'm going to object, Your Honor. He is now trying to self-authenticate a learned treatise as authoritative.

That is inappropriate on direct examination. It's only appropriate for impeachment or cross-examination at Rule of Evidence 707.

*The Court*: The objection is overruled. You can finish your answer.

[4] For example, plaintiff's other expert, Dr. Daniel Watson, testified without reliance on an authoritative treatise that the "the majority" of aortic dissections appear as an aortic abnormality on a chest x-ray.

V

Defendants next aver that the trial court erred by denying their pretrial motion in limine and permitting plaintiff to present to the jury three "new" theories of liability not found in her complaint: (1) the failure to include aortic dissection in the differential diagnosis, (2) obtaining an inadequate patient history and physical exam, and (3) the "failure to order a CT scan to rule out pneumothorax, pneumonia and pulmonary embolism." "Decisions concerning the meaning and scope of pleadings fall within the sound discretion of the trial court." *Dacon v Transue*, 441 Mich 315, 328; 490 NW2d 369 (1992). A trial court abuses its discretion only when its decision results in an outcome falling outside the range of principled outcomes. *Woodard, supra* at 557.

Plaintiff's complaint is not a model of detail. It alleges that Stone died of an aortic dissection and that Dr. Schipper violated the standard of care because he "failed to request diagnostic studies, including but not limited to, a chest X-ray . . . ." The complaint also alleges that Dr. Schipper should have obtained a surgical consultation and that "as a proximate [result] of the Defendants' failure to properly evaluate, diagnose and treat Plaintiff Decedent's condition, Plaintiff's Decedent was not appropriately treated for his cardiac condition, resulting in his death."

Dr. Schurgin testified at trial in a brief and limited fashion concerning Dr. Schipper's alleged failures to properly examine Stone or obtain a complete patient history. Although Dr. Schurgin did express that Dr. Schipper failed to obtain an adequate history and performed an incomplete physical examination, plaintiff focused throughout trial on Dr. Schipper's failure to order a chest x-ray. Plaintiff's counsel did not mention the allegedly inad-

equate patient history or physical examination in his closing argument. Rather, he argued that the

> whole theory here, the whole theory of Dr. Schurgin was, the most likely cause of the chest pain—the most likely cause based on presentation could have been a pneumothorax.
>
> And his thinking is, Let's look at it. Let's look at it; okay? And if you did that, that's what you'd find. You'd find a widening of the mediastinum; you'd find an aortic arch.

This case differs markedly from *Dacon, supra* at 334-335, in which the plaintiff sought to add an entirely new theory of liability during trial and essentially admitted the futility of proving the previously pleaded theories. Furthermore, defendants never asserted that they lacked an understanding of the nature of plaintiff's claims or an adequate opportunity to defend against them. Consequently, we find no abuse of discretion in the trial court's denial of defendants' motion in limine.

VI

Defendants further submit that the trial court improperly prevented their counsel from clarifying that the "purportedly reliable texts offered into evidence by . . . Plaintiff" did not amount to substantive evidence. We review for an abuse of discretion the trial court's decisions concerning "[w]hat constitutes a fair and proper" closing argument. See *Wilson v Gen Motors Corp*, 183 Mich App 21, 27-28; 454 NW2d 405 (1990).

In pertinent part, defense counsel told the jury the following:

> Dr. Schurgin talked about what would have shown up on a chest x-ray. And he said, Oh, in one book it's ninety percent; in another book it's eighty-eight percent.
>
> Did we see the study? Has the study been shown to you? The answer is no. If that study that Dr. Schurgin suppos-

edly relies on was evidence, it would have one of these little stickers on it, ladies and gentlemen. And I can promise you—

[*Plaintiff's counsel*]: Your Honor, again. [Defense counsel] knows that we cannot offer treatises in support of our case. They are limited for cross examination purposes and can never be admitted. And that's just wrong for him to say that. The rules of law won't allow me to do that.

[*Defense counsel*]: And that's my whole point.

*The Court*: Okay. The objection is sustained.

As defendants have correctly observed, the textbook statistics did not constitute admissible substantive evidence. Therefore, the trial court properly sustained plaintiff's objection. But notwithstanding the sustained objection, defendants' brief on appeal admits that their trial counsel successfully relayed to the jury that the statistics did not amount to substantive evidence. Furthermore, the trial court's ruling did not prevent defense counsel from discussing the statistics; the trial court only precluded argument that an adverse inference arose from the absence of the treatises as marked exhibits. Because the trial court did not err by precluding this improper argument, defendants are not entitled to relief on this ground. And even assuming that the trial court should have permitted defense counsel further comment regarding this issue, any potential error in limiting defense counsel's closing argument in no way compromised defendants' right to a fair trial or substantial justice. MCR 2.613(A).[5]

Affirmed.

---

[5] Because we find no basis for disturbing the jury verdict, we need not address defendants' appellate argument in Docket No. 284664 that "[i]f this Court reverses the lower court judgment, the award of costs and case evaluation sanctions must also be reversed."