# STATE OF MICHIGAN

# COURT OF APPEALS

---

ESTATE OF TERI RAY LUTEN, by JOSEPH
LUTEN, JR., Personal Representative,

Plaintiff-Appellee,

v

GENESYS REGIONAL MEDICAL CENTER and
THOMAS ROGERS, PA-C,

Defendants-Appellants,

and

GENERAL SURGEONS OF FLINT, PC and
BRIAN SHAPIRO, M.D.,

Defendants.

UNPUBLISHED
May 3, 2018

No. 335460
Genesee Circuit Court
LC No. 13-100741-NH

---

Before: GLEICHER, P.J., and BOONSTRA and TUKEL, JJ.

GLEICHER, J. (*concurring in part and dissenting in part*).

Plaintiff contends that the standard of care obligated defendant Thomas Rogers, a physician's assistant, to recommend that Teri Luten undergo an ERCP to identify the source of her postoperative bile leak. A general surgery expert testified that defendants' failure to obtain an ERCP resulted in Luten's worsening sepsis and complicated recovery. The majority concludes that "[i]t is pure speculation" that Rogers's recommendation would have resulted in an ERCP. This holding contradicts binding precedent and reflects a misunderstanding of basic causation principles. As to this aspect of the majority opinion, I respectfully dissent.

I

Dr. Brian Shapiro laparoscopically removed Teri Luten's gallbladder. Luten was discharged from the hospital the next day. She returned a few days later with abdominal pain, dizziness and anemia. A HIDA scan revealed a probable bile leak.[1] Dr. Shapiro and Rogers took Luten back to the operating room. They found "a large bile collection" in the left upper

---

[1] A HIDA scan is an imaging procedure that tracks bile flow through the gall bladder and liver.

quadrant of Luten's abdomen, and washed it out with multiple liters of fluid. They did not look for the source of the bile leak. A different surgeon later determined that Dr. Shapiro had clipped Luten's hepatic duct rather than her cystic duct, resulting in the leak. Luten's professional negligence claims against Dr. Shapiro and Rogers center on the former's negligence in injuring the hepatic duct during the first surgery, and both defendants' failure to determine the source of the bile leak during the January 13 operation.

Craig Baumgartner, a physician's assistant, testified as an expert witness on Luten's behalf. He opined that the applicable standard of care required Rogers to "make an independent decision . . . to identify the source of the bile leak" and to communicate that recommendation to Dr. Shapiro. Baumgartner explained that an ERCP should have been obtained to find the leak's source. If Rogers had suggested an ERCP but Dr. Shapiro refused to order one, Baumgartner opined, Rogers should have documented that conversation in Luten's medical record. He summarized, "[M]y problem with this case is . . . that . . . an ERCP wasn't ordered, a GI consult wasn't obtained. If he had spoken with his physician and they said don't need those, then to document that . . . ."

Dr. Jason Green, a general surgeon, testified that the standard of care mandated that Dr. Shapiro obtain an ERCP to determine the source of Luten's bile leak before reoperating. An ERCP would have changed the outcome in several respects, he explained, as it would have revealed "the correct diagnosis," thereby improving the outcome of Luten's subsequent surgeries.[2]

The majority declares that "plaintiff has failed to demonstrate even factual causation, much less proximate cause," emphasizing that the evidence "taken in a light most favorable to plaintiff, would not allow reasonable minds to conclude that but for Rogers's failure to discuss a GI consultation or ERCP with Dr. Shapiro, Luten's injuries would not have occurred." The majority rests this conclusion on Dr. Shapiro's testimony that an ERCP was not indicated. Based on this evidence, the majority concludes, "[i]t is pure speculation that a conversation between Rogers and Dr. Shapiro would have resulted in Dr. Shapiro ordering an ERCP or otherwise changed Luten's results."

The majority's analysis not only disregards plaintiff's evidence and finds facts, but overlooks the role played by reasonable inferences in establishing proximate cause. It therefore conflicts with our Supreme Court's order in *Martin v Ledingham*, 488 Mich 987; 791 NW2d 122 (2010), which compels an alternate result.

II

---

[2] Dr. Green elucidated:

So certainly by the 13th you would expect by the 14th the patient could be at a center and instead of being there on the 20th, now you have a six-day head start and six less days of bile peritonitis, bile leaking, at least SIRS, a septic-like syndrome that's getting worse and worse for a much better outcome for any and all surgeries that were subsequently done.

The majority's causation analysis fails to adhere to three central summary disposition principles: the evidence presented by the nonmoving party is to believed, reasonable inferences from that evidence are to be accepted, and a court may not engage in credibility assessments to find facts.

A medical malpractice plaintiff must present evidence demonstrating a causal link between the defendant's professional negligence and the plaintiff's injuries. To establish that causal link, a plaintiff must produce evidence supporting that the negligence actually and proximately caused the injury. The two causation concepts work in tandem. First, a plaintiff must demonstrate that "but for" the defendant's negligence, the plaintiff's injury would not have occurred. *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994). Once a plaintiff produces the factual support establishing a logical sequence of cause and effect, the plaintiff must also come forward with evidence supporting that the actual cause was proximate, meaning that it created a foreseeable risk of the injury the plaintiff suffered. *Lockridge v Oakwood Hosp*, 285 Mich App 678, 684; 777 NW2d 511 (2009); *Skinner*, 445 Mich at 160, 163. In a medical malpractice case, circumstantial evidence may suffice to demonstrate but-for causation, as long as the circumstantial evidence leads to "a reasonable inference of causation and [is] not mere speculation." *Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 87; 776 NW2d 114 (2009).

Dr. Green's testimony substantiates that but for defendants' failure to timely determine the source of Luten's bile leak, she would have avoided multiple complications and enjoyed a better outcome. Indisputably, this testimony suffices to establish a question of fact regarding both but-for and proximate cause as to Dr. Shapiro; counsel for Rogers admitted as much during oral argument. And although not explicitly stated in its opinion, I am confident that the majority would agree that summary disposition in favor of Dr. Shapiro on causation grounds would be improper, as Dr. Green's evidence suffices to establish both types of causation for summary disposition purposes. Dr. Shapiro's explanations or excuses for not doing the ERCP bear no relevance to a determination of whether Dr. Green's testimony sufficed to create a genuine issue of material fact regarding causation.

Yet the majority rules out Rogers's role in the causation equation based on Dr. Shapiro's belief that an ERCP "would have hindered Luten's prompt treatment for removal of bile," and urges that this testimony renders "pure speculation" that Rogers's input would have led to an ERCP. The majority errs by pinning its causation conclusions on Dr. Shapiro's self-serving testimony.[3] Dr. Shapiro's credibility regarding whether he would or would not have ordered an ERCP in the face of Rogers's recommendation is for a jury to decide. A jury is perfectly free to disbelieve retrospective, biased explanations inconsistent with the facts or the standard of care.

---

[3] The majority rejects that Dr. Shapiro's testimony was "self-serving," portraying him instead as having nobly fallen on his sword to protect Rogers. As a defendant, Dr. Shapiro was obligated to come up with an explanation for having neglected to perform an ERCP. He "took ownership" of the decision to forego the test because he had to. His defense depends on his ability to convince a jury that in neglecting to perform an ERCP he made a reasoned judgment that fell within the standard of care. Dr. Shapiro enhanced his own defense and served his own interests by claiming that an ERCP was unnecessary.

This Court is not permitted to rely on such contested evidence when analyzing the propriety of summary disposition, as the Supreme Court pointed out in *Martin*, 488 Mich at 988.

*Martin* also involved postsurgical decision-making and a doctor's testimony that he would have ignored information about the patient had it been provided by members of the healthcare team (in that cases, nurses). The plaintiff's experts (a doctor and a nurse) opined that the standard of care required that the nurse provide better reports to the attending surgeon about the plaintiff's postoperative condition. "The [expert] doctor further testified that, had that occurred, a different course of treatment should have been undertaken that would have prevented or mitigated plaintiff's injuries." *Martin v Ledingham*, 282 Mich App 158, 161; 774 NW2d 328 (2009). This Court found this evidence irrelevant in light of the defendant doctor's affidavit averring that had the nurses provided him with "earlier and better reports regarding plaintiff's postsurgical condition," he would have done nothing differently for the patient. *Id*. at 161-162. We held that the plaintiff's evidence "did not establish a 'reasonable inference[] of causation,' and a finding of causation from these facts would be 'mere speculation' at best." *Id*. at 163 (citation omitted, alteration in original). Using language strikingly similar to that of the majority, the *Martin* Court added, "We conclude that a fact-finder's determination that there was cause in fact merely because the fact-finder disbelieved the doctors involved would be exactly the kind of speculation that *Skinner* disapproved in the absence of any affirmative cause-in-fact proof advanced by plaintiff." *Id*.

The Supreme Court peremptorily and unanimously reversed, holding that the plaintiff's expert's testimony created a fact question regarding causation:

> [H]aving presented expert testimony regarding the treatment that the plaintiff, pursuant to the standard of care, should have received in the first 72 hours post-surgery, the treating physician's averment that he would have acted in a manner contrary to this standard of care presents a question of fact and an issue of credibility for the jury to resolve. [*Martin*, 488 Mich at 988.]

In my view, the majority in this case makes the same error as did the panel in *Martin.*

Here, both of plaintiff's experts testified that the standard of care required an ERCP. Dr. Green testified that but-for the failure to perform an ERCP, Luten's bile leak would have been discovered sooner. This testimony created a reasonable inference that if Rogers had suggested an ERCP, a physician adhering to the standard of care would have ordered one. The majority distinguishes *Martin* as applying to "information relayed by nurses" rather than a professional's recommendation regarding the standard of care. This is a distinction without a difference, as a standard of care recommendation relays "information" potentially more critical than a report of vital signs. Moreover, *Martin* addresses a treating physician's testimony about what he would or would not have done based on a communication, holding that such testimony is not conclusive.

*Martin* instructs that whether this Court views Dr. Shapiro's contrary testimony as compelling or believable is irrelevant. This is so because ultimately, a jury may decide to disbelieve Dr. Shapiro's view about what he would or would not have done had Rogers told him (or reminded him) of what the standard of care required. For example, in *Taylor v Mobley*, 279 Mich App 309, 314; 760 NW2d 234 (2008), this Court held that a jury justifiably rejected the

plaintiff's uncontradicted, unchallenged description of her personal pain and suffering after a dog bite. This Court observed that "the jury could have simply disbelieved and discredited plaintiff's testimony regarding pain and suffering." *Id*. We referred in a footnote to several additional cases standing for the proposition that "the jurors' prerogative to disbelieve testimony, including uncontroverted testimony, is well established." *Id*. at 314 n 5. Medical malpractice cases are not exceptions to that rule.[4]

The majority reaches faulty causation conclusions for a second reason: it neglects to view the record evidence in the light most favorable to Luten. It is telling that the majority spills considerable ink discussing Dr. Shapiro's reasons for not performing an ERCP and Rogers's defense of his own conduct. It is even more telling that after reciting this irrelevant evidence favoring the defense, the majority decides that a jury could not possibly disbelieve Dr. Shapiro, asserting, "The evidence, taken in a light most favorable to plaintiff, would not allow reasonable minds to conclude that but for Rogers's failure to discuss a GI consultation or ERCP with Dr. Shapiro, Luten's injuries would not have occurred."

Because this conclusion rests solely on the *defendant's* evidence it contravenes first principles of summary disposition. It ignores that the nonmoving party is entitled to the benefit of all reasonable inferences, regardless of the strength of the other side's proofs. "In determining whether there is a genuine issue as to any material fact, we consider the evidence in the light most favorable to the *nonmoving* party." *Kemp v Farm Bureau Gen Ins Co of Mich*, 500 Mich 245, 251; 901 NW2d 534 (2017) (emphasis added). This is not an option, but a command.

The genuine issue here relates to a fact that is not objectively provable: what would Dr. Shapiro have done if an ERCP had been suggested by the co-professional participant in the surgery? The answer depends on Dr. Shapiro's credibility. Although he testified that he would not have performed an ERCP, two expert witnesses—Dr. Green and Craig Baumgartner—testified that the standard of care required that an ERCP be performed. Could a jury reasonably decide that a general surgeon practicing within the standard of care would have opted for an ERCP when his physician's assistant suggested that it was the right thing to do? Certainly such a finding is plausible. That is why summary disposition is inappropriate when "questions of

---

[4] The majority misrepresents my position in *Taylor*, a dog-bite action in which the only evidence of damages presented to the jury was the plaintiff's testimony. The jury found liability but awarded the plaintiff nothing. The plaintiff argued on appeal that the verdict contravened the great weight of the evidence. I expressed that the jury's verdict "irreconcilably conflicted with unrebutted, unchallenged, and undeniable evidence" of damages. *Taylor*, 279 Mich App at 316. I argued that the majority's proclamation that "the jury was free to disbelieve plaintiff's testimony" meant that no challenge on great weight grounds could ever succeed, and suggested that "[a] determination whether a verdict contravenes the great weight of the evidence requires careful analysis of the actual evidence, not formulaic rationalizations." *Id*. at 321.

I pointed out that summary disposition analysis differs, as a nonmoving party may not avoid judgment by relying on jury disbelief instead of presenting evidence. That is no different than my position here. The majority fails to acknowledge that the testimony of Luten's experts is *evidence* giving rise to an inference. The majority makes the same mistake as did the *Taylor* majority—it relies on rationalizations and ignores actual evidence.

motive, intention," credibility, "or other conditions of the mind are [the] material issues" in the case. *Pemberton v Dharmani*, 207 Mich App 522, 529 n 1; 525 NW2d 497 (1994). A genuine issue of material fact exists because the record leaves open an issue about which reasonable minds could differ. *Debano-Griffin v Lake Co*, 493 Mich 167, 175; 828 NW2d 634 (2013).

The majority contends that a jury's potential disbelief of Dr. Shapiro amounts to nothing more than "speculation and conjecture." "Piling inference upon speculation," the majority exhorts, "is insufficient to survive summary disposition." Permitting a jury to disbelieve Dr. Shapiro would end summary disposition as we know it, the majority warns, opening the door to run-amok juries that "choose to disbelieve any evidence offered by a party and substitute [their] own speculation in its stead." The majority's parade of horribles turns the law of summary disposition upside down.

First, the norm is trial by jury, not summary disposition. See US Const, Am VII; Const 1963, art 1, § 14 ("The right of trial by jury as declared by the constitution must be preserved to the parties inviolate.") The United States Supreme Court has acknowledged that the federal court equivalent of MCR 2.116 (C)(10) "authorizes summary judgment only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, that no genuine issue remains for trial, and . . . the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Sartor v ArkansasNatural Gas Corp*, 321 US 620, 627; 64 S Ct 724; 88 L Ed 967 (1944). More recently the United Supreme Court highlighted that summary judgment is inappropriate where reasonable inferences support the need for resolution by a jury:

> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to [the plaintiff's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party. [*Tolan v Cotton*, __ US __; 134 S Ct 1861, 1868; 188 L Ed 2d 895 (2014).]

Second, the majority misapprehends the meaning of "reasonable inference" and the relationship of that term to the perspective through which we view causation evidence. Our Supreme Court has emphasized:

> As a theory of causation, a conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. There may be two or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any one of them, they remain conjectures only. On the other hand, if there is evidence which points to any one theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence. [*Kaminski v Grand Trunk W R Co*, 347 Mich 417, 422; 79 NW2d 899 (1956) (quotation marks and citation omitted).]

The key is a "logical sequence of cause and effect." The common law has never required direct evidence of causation, or barred reliance on inference.

Summary disposition is improper when a trier of fact reasonably could draw an inference supporting causation from the established facts.

> It is a basic proposition of law that determination of disputed issues of fact is peculiarly the jury's province. Even where the evidentiary facts are undisputed, it is improper to decide the matter as one of law if a jury could draw conflicting inferences from the evidentiary facts and thereby reach differing conclusions as to ultimate facts. [*Nichol v Billot*, 406 Mich 284, 301-302; 279 NW2d 761 (1979) (citations omitted).]

This admonition is particularly pertinent in the context of proximate cause: "The question of proximate cause is generally held to be one for the jury. Any doubts about the relations between the causes and the effects should be resolved by the jury. The determination of remoteness should seldom, if ever, be summarily determined." *Fiser v Ann Arbor*, 417 Mich 461, 475; 339 NW2d 413 (1983) (citations omitted), overruled on other grounds by *Robinson v Detroit,* 462 Mich 439; 613 NW2d 307 (2000).

A jury might decide that no matter what Rogers said, Dr. Shapiro would not have ordered an ERCP. But we need not speculate, as it does not matter whether Dr. Shapiro's view will ultimately prevail. The proper legal question is whether the evidence presented *could* support a reasonable jury determination that one of the causes of Luten's injuries was Rogers's failure to recommend an ERCP. See *Opdyke Investment Co v Norris Grain* Co, 413 Mich 354, 360; 320 NW2d 836 (1982) ("A genuine issue of fact is created when the affidavits, pleadings, depositions, admissions and documentary evidence, viewed in the light most favorable to the party opposing the motion, *might* permit inferences contrary to the facts as asserted by the movant.") (emphasis added). The evidence presented from Dr. Green and Mr. Baumgartner easily clears this hurdle.

The correct inquiry as to both actual and proximate cause is whether sufficient record evidence demonstrates that the defendant's negligence was "a cause of plaintiff's injury, and . . . that the plaintiff's injury [was] a natural and probable result of the negligent conduct." M Civ JI 15.01. Contrary to bedrock legal rules, the majority has weighed the evidence and decided that it favors Rogers. By failing to credit evidence that a reasonable physician's assistant would have recommended an ERCP and by refusing to acknowledge a reasonable inference that a surgeon conforming to the standard of care would have heeded that recommendation, the majority has substituted itself for a jury. I would affirm this aspect of trial court's summary disposition ruling.

That said, I concur with the majority that Rogers's failure to chart information regarding the bile leak or Luten's discharge instructions remain unconnected to Luten's injuries and damages. Plaintiff's experts did not provide testimony that supplies any reasonable inferences in this regard.

/s/ Elizabeth L. Gleicher