*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DANNY D. AULD II and TAMARA AULD,

Plaintiffs-Appellants,

v

MCLAREN REGIONAL MEDICAL CENTER,
GJON G. DUSHAJ, M.D., and PAUL W.
BROWN, D.O.,

Defendants-Appellees,

and

HATEM ATAYA, M.D., and HATEM M.
ATAYA, M.D., PC,

Defendants.

UNPUBLISHED
February 26, 2019

No. 341335
Genesee Circuit Court
LC No. 13-101457-NH

Before: JANSEN, P.J., and BECKERING and O'BRIEN, JJ.

PER CURIAM.

In this medical malpractice action, plaintiffs, Danny D. Auld II and Tamara Auld,[1] appeal as of right from a stipulated order of dismissal as to defendants Hatem Ataya, M.D., and Hatem M. Ataya, M.D., PC. On appeal, plaintiff challenges an earlier order of the trial court that granted the motion for partial summary disposition of defendants McLaren Regional Medical Center (McLaren), Gjon G. Dushaj, M.D., and Paul W. Brown, D.O., pursuant to MCR 2.116(C)(10). Because the record shows that plaintiff presented evidence creating a genuine issue of material fact with regard to causation, we reverse the trial court's order and remand the matter for further proceedings.

---

[1] Because plaintiff Tamara Auld's claim is merely derivative of plaintiff Danny D. Auld II's claim, "plaintiff" refers to Danny D. Auld II.

# I. BASIC FACTS AND PROCEDURAL HISTORY

On November 9, 2011, plaintiff, who suffers from Marfan syndrome,[2] was experiencing "pain in his right rib/back area." He rated the pain 10 out of 10. Emergency medical services (EMS) transported plaintiff to McLaren's emergency room, where he spent approximately 5 ½ hours undergoing various tests before being released without a diagnosis but still experiencing "severe pain." He returned to McLaren's emergency room two days later because he once again was experiencing "unbearable" pain. The emergency room staff was unable to diagnose plaintiff and eventually decided to admit him to the hospital on November 12, 2011. Defendants Dr. Brown and Dr. Dushaj were the emergency room physicians who treated plaintiff.

Around 10:55 a.m. on November 13, 2011, plaintiff discovered that he was unable to move his legs. At that point, arrangements were made to transfer him to the University of Michigan Hospital (U of M) in Ann Arbor, Michigan, where he arrived at approximately 5:00 p.m. U of M physicians noted that plaintiff had developed "[a]cute paraplegia." He underwent a "stat CT scan of the thoracolumbosacral spine with an angiogram followed immediately by an MRI of the cervicothoracic and lumbar spine," which revealed a spinal epidural abscess from plaintiff's T5 to T9 vertebrae. He was taken emergently to the operating room for a decompressive laminectomy, but the surgery was unable to reverse plaintiff's paraplegia.

On October 25, 2013, plaintiff filed a complaint for medical malpractice alleging that defendants breached the standard of care and caused him harm by failing to timely diagnose and treat his spinal epidural abscess and to transfer him to a tertiary care hospital where doctors could diagnose and treat his condition. Plaintiff also alleged that defendants breached the standard of care by failing to order magnetic resonance imaging (MRI) or computerized tomography (CT) scans of his spine, to consult with a Marfan syndrome specialist, and to consider lesions caused by Marfan syndrome when performing plaintiff's differential diagnosis. Plaintiff attached to his complaint two affidavits of merit from his standard of care expert, Eugene Saltzberg, M.D., each stating, "[h]ad the delay in diagnosis and treatment not occurred, [plaintiff] would not be paralyzed today and would not have suffered his other related injuries." On November 14, 2013, defendants filed their answer to plaintiff's complaint, attaching affidavits of merit asserting that they did not breach the standard of care, which called for them to reach a differential diagnosis after reviewing plaintiff's medical history and test results and then to make the appropriate referrals.

The parties proceeded to conduct discovery, during the course of which defendants' attorney deposed plaintiff's standard of care expert, Eugene E. Saltzberg, M.D., in October 2015, and his causation expert, James A. Vascik, M.D., in February 2016. Dr. Saltzberg, a board certified emergency room physician, testified that Marfan syndrome increases the likelihood of

---

[2] "Marfan's [sic] syndrome is 'a congenital disorder of connective tissue characterized by abnormal length of the extremities, especially of fingers and toes, . . . cardiovascular abnormalities (commonly dilatation of the ascending aorta), and other deformities.' " *Lockridge v Oakwood Hosp*, 285 Mich App 678, 685 n 2; 777 NW2d 511 (2009).

dural ectasia,[3] and that defendants breached the standard of care when they failed to perform a dural ectasia evaluation during either of plaintiff's trips to the emergency room. Dr. Saltzberg testified that to comply with the standard of care, the defendant physicians "should have ordered an MRI or a CT of the chest, abdomen, pelvis, and spine during the ER visit, an [sic] admission that's on the 9[th] and the 11[th]," and conducted a "focused spine radiological study" to evaluate for dural ectasia. Had they done so, Dr. Salzberg testified that "they would have found [plaintiff's] spinal epidural abscess."

Dr. Vascik, a neurosurgeon, testified regarding the proximate cause of plaintiff's injuries. Specifically, he testified as to how late in time plaintiff's spinal epidural abscess could have been diagnosed and treated and still have achieved a better outcome. Dr. Vascik testified that if surgery been completed any time before 10:00 a.m. on November 13, 2011, which was the time a radicular sign showed up in plaintiff's medical records, he had an "[o]ver 90 percent" chance of walking out of the hospital in two to four weeks, without paraplegia. Dr. Vascik opined that plaintiff sustained neurologic function damage as a result of a failure to diagnose or treat his condition at an earlier point in time.

Defendant's attorney asked Dr. Vascik whether he was familiar with "the algorithms for diagnosing dural ectasia." Dr. Vascik testified that he was not. He asked whether Dr. Vascik was familiar with the criteria for diagnosing dural ectasia in a Marfan patient; Dr. Vascik testified that he was not. He asked whether Dr. Vascik had done any studies or research at all into the presence of dural ectasia on MRI's or CT scans; he testified that he had not. Dr. Vascik made clear that he was not an emergency room physician and that he was not rendering any opinions regarding the standard of care or any breaches of the standard of care by any physician. Thus, he was not offering any opinions relative to the standard of care for plaintiff's physicians or whether plaintiff's condition could or should have been diagnosed prior to the morning of November 13, 2011. Dr. Vascik was asked about his familiarity with where dural ectasia is typically located, and he testified that of the times he had seen it, although he's done no studies, it involved the lumbar spine and sacrum. When defendant's attorney stated that 97% to 99% of the time they are found in that area, Dr. Vascik responded by saying "[t]hat's pretty much most." And he agreed that an MRI or a CT scan of the lumbar spine would not show the mid-thoracic spine, which is where plaintiff's spinal epidural abscess was located. Dr. Vascik also testified that he did not believe that the spinal epidural abscess would have been visible on a CT with contrast if such a CT was performed on either November 9, 2011, or November 11, 2011, the days that plaintiff presented to the McLaren emergency room. In fact, a CT with contrast was done at McLaren of plaintiff's abdomen, which showed a portion of his thoracic spine, yet Dr. Vascik did not observe a spinal problem on that CT.[4]

---

[3] Dural ectasia is enlargement of the dura, the fluid-containing membrane that surrounds the brain and spinal column.

[4] Relevant to this point, Dr. Saltzberg had testified that his opinion that the standard of care called for a full work up for dural ectasia would not change, even if a CT scan "[did] not reflect

On February 23, 2016, defendants filed a motion for partial summary disposition pursuant to MCR 2.116(C)(10) (no genuine issue of material fact, movant entitled to judgment as a matter of law). Relative to the instant appeal, defendants argued that partial summary disposition was appropriate because plaintiff failed to establish proximate cause, an element essential to a claim of medical malpractice. They pointed specifically to Dr. Vascik's testimony and argued that, even if defendants had evaluated plaintiff for dural ectasia, which typically involved the lumbar spine, defendants still would not have discovered the spinal epidural abscess located in plaintiff's thoracic spine. Relying on this testimony, defendants argued that plaintiff failed to connect "the only breach of the standard of care articulated by Dr. Saltzberg and the ultimate outcome in this case." In response, plaintiff argued that defendants' proximate cause "algorithm" was a fallacy, as the ultimate focus of the MRI was not to diagnose dural ectasia, but to discover the cause of the pain which was focused in the area of the mid-back and which may or may not be caused by dural ectasia. Plaintiff argued that the first time an MRI of the thoracic spine was performed, plaintiff's condition was diagnosed, and inquiry into dural ectasia under the presenting circumstances would have led them to the correct diagnosis. Plaintiff contended that defendants' focus on dural ectasia alone was too narrow. In reply, defendants stated that their focus on dural ectasia was appropriate, given Dr. Saltzberg's testimony that he intended to testify at trial that defendants breached the standard of care by failing to evaluate plaintiff for dural ectasia.

At the March 28, 2016 hearing on defendants' motion, the parties argued in accordance with their briefs. The trial court found defendants' argument persuasive. Explaining its ruling from the bench, the trial court stated, "The claim is they [i.e., the defendant physicians] failed to do the work up for dural ectasia and that would be generally, almost always, lumbar. And I think the motion has to be granted under the testimony of . . . Vascik . . . as outlined in [defendants'] brief." The trial court entered an order granting defendants' motion for partial summary disposition on April 5, 2016.

Plaintiff filed a number of post-judgment motions in the trial court and this Court. Included among them is an April 25, 2016 motion asking the trial court to reconsider its summary disposition decision. Because plaintiff merely reiterated the arguments plaintiff made in his response to defendants' motion for partial summary disposition, the trial court denied that motion in an order entered May 17, 2016. Subsequently, plaintiff filed a motion for leave to appeal in this Court, which we denied in an order entered November 9, 2016.[5] We also denied plaintiff's timely motion for reconsideration.[6] On November 15, 2017, the trial court entered a

---

any dural ectasia on the abdominal film" because "[y]ou need a focused spine radiological study…to see dural ectasia."

[5] *Auld v McLaren Regional Med Ctr*, unpublished order of the Court of Appeals, entered November 9, 2016 (Docket No. 333249). Plaintiff filed additional motions in this Court and the trial court, such as motions to stay the proceedings in the trial court and for immediate consideration of the motions filed in this Court, but we need not address these motions further.

[6] *Auld v McLaren Regional Med Ctr*, unpublished order of the Court of Appeals, entered December 20, 2016 (Docket No. 333249).

stipulated order of dismissal as to Dr. Ataya and Hatem M. Ataya, M.D., PC. It is from this order that plaintiff now appeals by right.

## II. ANALYSIS

On appeal, plaintiff argues that the trial court, relying on the expert testimony of Dr. Vascik, erroneously concluded that there was no genuine issue of material fact with regard to the issue of proximate causation. We agree.

This Court reviews a trial court's decision on a motion for summary disposition de novo. *Auto-Owners Ins Co v Campbell-Durocher Group Painting & Gen Contracting, LLC*, 322 Mich App 218, 224; 911 NW2d 493 (2017). "A motion for summary disposition brought pursuant to MCR 2.116(C)(10) tests the factual support for a claim." *Patrick v Turkelson*, 322 Mich App 595, 605; 913 NW2d 369 (2018) (quotation marks and citation omitted). This Court considers the "pleadings, admissions, and other evidence submitted by the parties in the light most favorable to the nonmoving party." *Id*. (quotation marks and citation omitted). "Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "A genuine issue of material fact exists 'when reasonable minds could differ on an issue after viewing the record in the light most favorable to the nonmoving party.' " *Auto-Owners Ins Co*, 322 Mich at 224, quoting *Allison v AEW Capital Mgt, LLP*, 481 Mich 419, 425; 751 NW2d 8 (2008).

"A plaintiff in a medical malpractice action must establish '(1) the applicable standard of care, (2) breach of that standard of care by the defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury.' " *Elher v Misra*, 499 Mich 11, 21; 878 NW2d 790 (2016), quoting *Locke v Pachtman*, 446 Mich 216, 222; 521 NW2d 786 (1994). At issue is whether the trial court erred in determining that plaintiff failed to establish a genuine issue of material fact about the fourth element: proximate cause.

"Proximate cause is a legal term of art that incorporates both cause in fact and legal (or proximate) cause." *Teal v Prasad*, 283 Mich App 384, 391; 772 NW2d 57 (2009) (quotation marks and citations omitted). Cause in fact, or factual cause, "generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred." *Id*., quoting *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994). "Legal or proximate cause normally involves examining the foreseeability of consequences and whether a defendant should be held legally responsible for them." *Lockridge v Oakwood Hosp*, 285 Mich App 678, 684; 777 NW2d 511 (2009). "To establish legal cause, the plaintiff must show that it was foreseeable that the defendant's conduct 'may create a risk of harm to the victim, and ... [that] the result of that conduct and intervening causes were foreseeable.' " *Id*., quoting *Weymers v Khera*, 454 Mich 639, 648; 563 NW2d 647 (1997) (quotation marks and citation omitted). In a medical malpractice action, "[e]xpert testimony is required to establish the standard of care and a breach of that standard, as well as causation." *Kalaj v Khan*, 295 Mich App 420, 429; 820 NW2d 223 (2012) (citations omitted). Proximate cause, i.e., factual cause and legal cause, "is a question of fact for the jury to decide unless reasonable minds could not differ regarding the issue." *Lockridge*, 285 Mich App at 684. If a plaintiff fails to establish factual cause, then legal cause is not a relevant issue. *Ray v Swager*, 501 Mich 52, 64; 903 NW2d 366 (2017).

Defendants' contention that plaintiff failed to present evidence creating a genuine issue of material fact as to causation rests on the following deposition testimony from Dr. Vascik:

*Q* [DEFENSE COUNSEL]. All right. In fact, dural ectasia is a condition thought to be involving the sacrum of the spine, correct, predominantly?

*A* [DR. VASCIK]. You can see it in the lumbar spine also. That is where it's most predominant.

*Q*. Not just most, but 97 to 99 percent of all of them are found in that area. Correct?

*A*. That's pretty much most.

\* \* \*

*Q*. We can agree if an MRI or CT scan is done for whatever reason, to look for dural ectasia, it will not image the thoracic spine. Correct?

*A*. Did your question say if an MRI of the lumbar spine is shown?

*Q*. Yes.

*A*. Of course it doesn't.

\* \* \*

*Q*. All right. So if, in fact, we go back and change history and a CT scan with contrast had been performed at McLaren Hospital on either the 9th or 11th, you don't believe it would have shown a spinal epidural abscess?

*A*. More likely than not, no, but I would say no.

The trial court also relied on this testimony to grant defendants' motion for partial summary disposition, and the court proceeded to a final judgment, as described above.

Based on our review of the evidence submitted with respect to defendants' motion for partial summary disposition, we conclude that defendants' position fails because plaintiff's standard of care expert, Dr. Saltzberg, did not limit his testimony to requiring an MRI of the lumbar spine. Dr. Saltzberg testified that the standard of care for a patient with Marfan syndrome with the specific symptoms plaintiff had, which included "pain inferior to the right scapula," "pain in the right flank," "pain in the lumbosacral area," "pain in the thoracic vertebrae area," pain that "moves around" but "[a]ll related to the back" called for "an MRI or a CT of the chest, abdomen, pelvis, and spine," and that a "focused spine radiological study" was necessary "to see dural ectasia." The point, Dr. Saltzberg testified, "is they didn't do the proper radiological evaluation of the spine." Dr. Vascik's remarks were based on a hypothetical scenario that did not match Dr. Saltzberg's standard of care testimony, and he clarified before responding that the question at issue was whether "an MRI of the lumbar spine" would "image

-6-

the mid thoracic spine." He did not opine that an MRI of the chest or a focused spine radiological study would fail to reveal plaintiff's presenting condition. To the extent Dr. Vascik gave any opinion testimony regarding what tests he would order under certain presenting conditions, such testimony is irrelevant and inadmissible here, as it is undisputed that he is not qualified under MCL 600.2169 to render standard of care opinions regarding emergency room physicians.

The essence of Dr. Saltzberg's opinion was not that the defendant doctors breached the standard of care by failing to diagnose a dural ectasia per se. Rather, it was failing to perform the evaluation for dural ectasia called for by the standard of care based on plaintiff's presentation at the emergency room, because those tests—even if they did not show dural ectasia—would have revealed plaintiff's spinal epidural abscess.

Nothing in Dr. Saltzberg's testimony indicates that he considered the "proper radiological evaluation of the spine" to be an evaluation of the lumbar spine only, especially given his awareness that plaintiff's pain "kind of moved around" and could have radiated from a spinal disorder in the thoracic vertebra area. He explained that, in spinal disorders in the thoracic area, "the pain will radiate to the abdomen." Dr. Saltzberg testified to a standard of care that called for the proper evaluation of the entire spine, not just that part of the spine where dural ectasia most likely occurs statistically. Dr. Saltzberg's assertion that emergency room doctors practice medicine based on clinical presentation, not on statistics, also supports such an inference.

Defendants argue on appeal that even if plaintiff raised a genuine issue of material fact regarding but-for causation, his theory that proper evaluation for dural ectasia would have resulted in the discovery of plaintiff's spinal epidural abscess by reason of "serendipity" is too remote to constitute the legal cause prong of proximate cause. Given this Court's recognition in *Lockridge*, 285 Mich App at 689, that "[t]he diagnostic process may yield unexpected results," this argument is unpersuasive

The relevant issue in *Lockridge* was whether defendants were liable for neglecting to order a chest x-ray for a condition the patient did not have when the x-ray arguably would have revealed the presence of an aortic abnormality and prompted further testing that would have allowed diagnosis of the unforeseeable, fatal condition the patient did have. Holding that they were, this Court observed that, inherent in the diagnostic process is the assumption that one test "may reveal information relevant to a variety of diagnoses," and that the legal issue was not foreseeability of a patient's specific injuries, but "whether the patient's injuries and damages arising from the missed diagnosis qualify as a natural and probable result of the defendant's negligent conduct." *Lockridge*, 285 Mich App at 689 (quotation marks and citation omitted). "The diagnostic process may yield unexpected results, as in this case. But an unforeseen diagnosis does not relieve a physician from liability if the patient's actual condition would have been diagnosed naturally and probably had the physician complied with the standard of care." *Id*.

In the instant case, Dr. Saltzberg testified that if the defendant physicians had conformed to the standard of care by conducting a proper evaluation for dural ectasia, based not on statistical probabilities but upon plaintiff's presenting condition, they would have discovered plaintiff's spinal epidural abscess. Defendants contend that *Lockridge* is inapplicable to the case

at bar because the breach in the standard of care in *Lockridge*—failure to take a chest x-ray—was directly related to the patient's undiagnosed fatal condition, aortic dissection, because it would have been revealed in the chest x-ray. Defendants thus argue that in *Lockridge*, there was no claim that a test in one area of the body should reveal a harmful condition in another part of the body. This argument arises from Dr. Vascik's testimony that a test for dural ectasia on the lumbar spine would not have revealed a spinal epidural abscess on the thoracic spine. As already addressed, however, Dr. Saltzberg's testimony indicated that the applicable standard of care under plaintiff's presenting circumstances called for a "proper" evaluation of the entire spine as described above, not just that part of the spine where dural ectasia is statistically most likely to occur.

Viewing the evidence submitted by the parties in the light most favorable to plaintiff, *Patrick*, 322 Mich App at 605 (quotation marks and citation omitted), we conclude for the reasons stated above that plaintiff created a genuine issue of material fact as to proximate cause. Accordingly, we reverse the trial court's order granting partial summary disposition to defendants, and remand the matter to the trial court for further proceedings.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Kathleen Jansen
/s/ Jane M. Beckering
/s/ Colleen A. O'Brien