*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ESTATE OF EFFIE TAYLOR, by ORAS
TAYLOR, Personal Representative,

        Plaintiff-Appellee,

v

UNIVERSITY PHYSICIAN GROUP, LEGACY
SHGD, VHS SINAI GRACE HOSPITAL, INC.,
TENET HEALTHCARE CORPORATION, VHS
OF MICHIGAN, INC., VHS PHYSICIANS OF
MICHIGAN, DMC LAHSER AMBULATORY,
and DMC LAHSER CAMPUS,

        Defendants
and

FRANKLIN MEDICAL CONSULTANTS, PC,
and MANUEL SKLAR,

        Defendants-Appellants.

FOR PUBLICATION
July 25, 2019
9:15 a.m.

No. 338801
Oakland Circuit Court
LC No. 2015-147003-NH

Before: GLEICHER, P.J., and STEPHENS and O'BRIEN, JJ.

GLEICHER, P.J.

        This medical malpractice case arises from a colonoscopy performed by defendant Manuel Sklar, M.D., on plaintiff's decedent, Effie Taylor. During the procedure, Dr. Sklar observed lesions in Taylor's colon that he believed were arteriovenous malformations, called AVMs. Dr. Sklar biopsied the suspected AVMs. Three days later, Taylor developed colorectal bleeding. Despite the emergent removal of her entire colon, Taylor died.

        Plaintiff claims that Dr. Sklar breached the standard of care by biopsying the AVMs, particularly since Taylor had recently taken Plavix, a blood thinner, and was a devout Jehovah's Witness who refused blood transfusions. Plaintiff's expert witness, Dr. Todd Eisner, testified

that the improper and unindicated biopsies caused the bleeding that ultimately led to Taylor's death.

Sklar's defense focuses on causation. His expert witness, Dr. Veslav Stecevic, performed an emergent colonoscopy on Taylor the day before she died, looking for the source of the bleeding in her colon. According to Dr. Stecevic, the bleeding originated at the site of a ruptured diverticulum, which Dr. Stecevic opined, was wholly incidental to the biopsies and a "random" event. Defendants assert that Dr. Stecevic's testimony must be believed. Crediting Dr. Stecevic, defendants reason, demands the entry of summary disposition in favor of Dr. Sklar.

The circuit court disagreed, and so do we. Given Dr. Sklar's testimony that he biopsied AVMs and Dr. Eisner's reasonable explanation that the biopsy of the AVMs likely caused Taylor's hemorrhage, Dr. Stecevic's testimony creates a fact question regarding the source of the fatal bleeding. As in every case involving eyewitness testimony, a jury is free to believe or disbelieve the witness's account. That the eyewitness is a physician does not defeat this rule.

I

At his deposition, Dr. Sklar acknowledged awareness that Taylor, a 79-year-old woman and a Jehovah's Witness, had been taking Plavix before the colonoscopy. He instructed her to discontinue the Plavix five to seven days before the procedure; according to the medical record, Taylor stopped taking the drug only three days before. Dr. Eisner opined that Taylor still had Plavix in her system at the time of the colonoscopy, "which would be another reason not to take biopsies in a Jehovah's Witness, especially of what he thought was an AVM."

Dr. Sklar dictated the official operative report on the day of the colonoscopy. He noted that a segment of Taylor's ascending colon "had an appearance of multiple small blood vessels suggestive for an extensive AVM malformation." The report continues, "Biopsies were taken." Dr. Sklar's "final diagnoses," as recorded in the medical record, were "[d]iverticulosis and arteriovenous malformations." At his deposition, Dr. Sklar repeatedly confirmed that he biopsied "a vascular lesion" (an AVM is an abnormal collection of coalesced blood vessels). Dr. Sklar's records do not support that he biopsied a diverticulum, and he did not report any diverticular bleeding.

Three days after the colonoscopy, Taylor presented at Beaumont Hospital with rectal bleeding. An angiogram failed to locate the bleeding's source. Dr. Stecevic performed a colonoscopy to locate the source of the blood and to stem its flow. He claimed that he did not see any AVMs during his examination of Taylor's colon and asserted that there were none. According to Dr. Stecevic, Dr. Sklar had not biopsied an AVM, despite that Dr. Sklar's records and testimony support that he did:

> *Q.* Do you believe that Dr. Sklar biopsied an [AVM]?
>
> *A.* No.
>
> *Q.* Why?
>
> *A.* Because there was no [AVM].

-2-

In Dr. Stecevic's opinion, Taylor was bleeding from a diverticulum, which is a "deep pocket" in the intestinal wall. That Taylor was bleeding from a diverticulum three days after undergoing biopsies of her colon was "simply a coincidence," Dr. Stecevic opined, because a bleeding diverticulum is a "random event."

Dr. Stecevic recorded that he found "[r]ed blood . . . in the entire colon" during the second colonoscopy, and performed a "[l]imited exam due to large amount of blood in the entire colon." Dr. Stecevic injected epinephrine into what he thought was a bleeding diverticulum. He noted that this successfully staunched the hemorrhage coming from Taylor's colon. But Taylor continued to bleed. To try to save her life, a surgeon removed her entire colon. Dr. Stecevic conceded that the surgery was performed because there may have been other sources of bleeding. Despite this effort, Taylor died.

II

Dr. Eisner testified that Dr. Sklar biopsied an AVM. This testimony is consistent with that of Dr. Sklar, who documented and testified that he had biopsied an AVM. Dr. Eisner explained that Dr. Sklar's description of the lesion he biopsied matched an AVM, and that it is common for AVMs to be found in the right colon, where Dr. Sklar performed the biopsies. "I have no reason to doubt when he said it was an AVM that it was an AVM," Dr. Eisner declared.

Dr. Eisner explained that diverticular bleeding is "very rare, however old you are," and is not a reported complication of a colonoscopy. He offered several additional reasons for disbelieving that the bleeding observed by Dr. Stecevic came from a spontaneously ruptured diverticulum rather than a recently biopsied AVM. There was a considerable amount of blood in Taylor's colon, as Dr. Stecevic admitted. When there is a lot of blood in the colon, Dr. Eisner opined, "it's going to pool in the diverticular pockets and then it will come out of the pocket. It can look like the diverticulae are bleeding." Dr. Eisner posited that if the surgeon who removed Taylor's entire colon believed that the bleeding came from a single ruptured diverticulum, the surgeon would have removed only the portion of the colon surrounding that diverticulum. And Dr. Eisner questioned why the bleeding in Taylor's colon continued if it was only diverticular and had been effectively controlled by the shot of epinephrine, as claimed by Dr. Stecevic. He summarized, "It would be an unusual coincidence for her to have a bleeding diverticulum after what the gastroenterologist thought was an AVM, was biopsied when she took Plavix, and then she started to bleed after that."

III

Defendants filed a motion for summary disposition based on Dr. Stecevic's deposition testimony, contending that the evidence proved that Taylor's death was caused by a bleeding diverticulum rather than a biopsied AVM. According to defendants, Dr. Eisner ignored this evidence when forming his opinion. Plaintiff pointed out that her claim involved informed consent as well as Dr. Sklar's negligence in biopsying an AVM. Plaintiff also cited the deposition of Dr. Michael Fishbein, a pathology expert from the University of California, Los

Angeles who allegedly reviewed pathological slides from the colonoscopy that revealed "widespread angiodysplasia," a term used interchangeably with AVM to mean "that the tissue contained abnormally formed blood vessels that involve both venous and arterial structures."[1]

The trial court denied defendants' motion, stating, "The Court finds that summary disposition is not appropriate. Plaintiff has produced sufficient expert witness testimony to establish a question of fact regarding whether Defendant negligently performed biopsies that caused the fatal bleed." Defendants filed an application for leave to appeal the trial court's order denying summary disposition, which this Court granted. *Estate of Effie Taylor v Univ Physician Group*, unpublished order of the Court of Appeals, entered November 15, 2017 (Docket No. 338801).

IV

We consider the circuit court's summary disposition decision de novo by familiarizing ourselves with the pleadings, admissions, affidavits, and other record documentary evidence "in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial." *Walsh v Taylor*, 263 Mich App 618, 621; 689 NW2d 506 (2004). When the record leaves open an issue on which reasonable minds could differ, a genuine issue of material fact exists, precluding summary disposition. *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003).

Viewing the evidence in the light most favorable to the nonmoving party means that a court may not make findings of fact or assess the credibility of witnesses. *White v Taylor Distrib Co, Inc*, 482 Mich 136, 142-143; 753 NW2d 591 (2008). Summary disposition is improper when a trier of fact could reasonably draw an inference supporting causation from the established facts:

> It is a basic proposition of law that determination of disputed issues of fact is peculiarly the jury's province. Even where the evidentiary facts are undisputed, it is improper to decide the matter as one of law if a jury could draw conflicting inferences from the evidentiary facts and thereby reach differing conclusions as to ultimate facts. [*Nichol v Billot*, 406 Mich 284, 301-302; 279 NW2d 761 (1979) (citations omitted).]

The United States Supreme Court has underscored the reasons that summary judgment is inappropriate where witnesses to an event provide starkly different descriptions of what they saw, heard, or perceived.[2] *Tolan v Cotton*, 572 US 650; 134 S Ct 1861; 188 L Ed 2d 895 (2014),

---

[1] As defendants point out in their brief on appeal, Dr. Fishbein's deposition transcript was not provided below, and has not been provided on appeal. Defendants have not denied the accuracy of plaintiff's description of his testimony. Nevertheless, we have not considered it in reaching our decision.

[2] Michigan's standards for summary disposition mirror the standards for summary judgment in federal court. See *Maiden v Rozwood*, 461 Mich 109, 124; 597 NW2d 817 (1999).

arose from a police shooting at the home of a man suspected of having stolen a car. The legal issue presented was whether the officer was entitled to qualified immunity, which immunizes an officer from liability when the use of force is reasonable. *Id*. at 651. Witnesses to the shooting disputed the lighting conditions, the words and tones of voice used by the participants, whether a threat was made, and the demeanor of the people present at the scene. *Id*. at 658-659. Despite these discrepancies, the federal district court granted summary judgment in favor of the defendant and the United States Court of Appeals for the Fifth Circuit affirmed.

The Supreme Court reversed, highlighting that at the summary judgment stage, courts must not sort through the evidence to find truth; that job is reserved for the jury. In language pertinent to the case before us, the Supreme Court emphasized the importance of viewing the evidence in the light most favorable to the nonmoving party:

> The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases. It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system. By weighing the evidence and reaching factual inferences contrary to [the plaintiff's] competent evidence, the court below neglected to adhere to the fundamental principle that at the summary judgment stage, reasonable inferences should be drawn in favor of the nonmoving party. [*Id*. at 660.]

Like *Tolan*, this case involves the testimony of an eyewitness. Were we to credit only Dr. Stecevic's testimony and disregard Dr. Sklar's, we would fall into the same error condemned by the Supreme Court in *Tolan*. Dr. Sklar testified that he biopsied an AVM. Dr. Eisner drew a reasonable inference that a biopsied AVM is likely to bleed profusely, particularly when a patient has recently taken a blood thinner. Given Dr. Stecevic's admission at deposition that there may have been multiple bleeding sources in Taylor's colon, his claim that Taylor's colon contained no AVMs at all, and his subjective judgment that he found a bleeding diverticulum create a fact question regarding the source of Taylor's fatal bleed.

V

A medical malpractice plaintiff must present evidence demonstrating a causal link between a defendant's professional negligence and the plaintiff's injury. Expert testimony is required. *Pennington v Longabaugh*, 271 Mich App 101, 104; 719 NW2d 616 (2006). As in every negligence case, two causation concepts work in tandem. First, a plaintiff must demonstrate that "but for" the defendant's negligence, the plaintiff's injury would not have occurred. *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994). Once a plaintiff produces the factual support establishing a logical sequence of cause and effect, the plaintiff must also come forward with evidence supporting that the actual cause was proximate, meaning that it created a foreseeable risk of the injury the plaintiff suffered. *Id*.; *Lockridge v Oakwood Hosp*, 285 Mich App 678, 684; 777 NW2d 511 (2009). In a medical malpractice case, circumstantial evidence may suffice to demonstrate but-for causation, as long as the circumstantial evidence "lead[s] to a reasonable inference of causation and [is] not mere speculation." *Ykimoff v WA Foote Mem Hosp*, 285 Mich App 80, 87; 776 NW2d 114 (2009). "While a plaintiff need not prove that an act or omission was the *sole* catalyst for his injuries, he

must introduce evidence permitting the jury to conclude that the act or omission was *a* cause." *Craig v Oakwood Hosp*, 471 Mich 67, 87; 684 NW2d 296 (2004).

Defendants' causation argument in this case rests on the following language from *Green v Jerome-Duncan Ford, Inc*, 195 Mich App 493, 498-499; 491 NW2d 243 (1992): "An expert witness need not rule out all alternative causes of the effect in question, but he must have an evidentiary basis for his own conclusions. This Court has held that an expert's opinion was objectionable because it was based on assumptions that did not accord with the established facts." (Citations omitted.) In *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 286; 602 NW2d 854 (1999), this Court cited *Green* in support of its holding that expert testimony is inadmissible when it "is inconsistent with the testimony of a witness who personally observed an event in question, and the expert is unable to reconcile his inconsistent testimony other than by disparaging the witness'[s] power of observation." According to defendants, Dr. Eisner's expert testimony that Dr. Sklar biopsied an AVM is inconsistent with Dr. Stecevic's testimony that he found a bleeding diverticulum. *Badalamenti* is "directly on point," defendants insist, and compels that Dr. Eisner's testimony be stricken.

Defendants' logic harbors a critical flaw. Dr. Sklar documented in the medical record and testified at deposition that he biopsied an AVM. Dr. Stecevic disputed that Dr. Sklar had biopsied an AVM. Given this evidence, the expert "disparaging" the eyewitness's power of observation is Dr. Stecevic, not Dr. Eisner. Viewed in the light most favorable to plaintiff, the evidence supports several reasonable factual conclusions relevant to causation, including that Mrs. Taylor had *both* an AVM that caused unchecked bleeding after it was biopsied, and a bleeding diverticulum. Alternatively, based on evidence of record, a jury may reasonably conclude that Dr. Stecevic incorrectly identified the bleeding he saw as emanating from a diverticulum rather than from an AVM biopsy site. Multiple conflicts in the evidence give rise to genuine issues of material fact regarding the cause of Taylor's fatal bleed, precluding summary disposition.

Defendants' reliance on *Badalamenti* is misplaced, as the facts of that case differ in critical ways from those presented here. In *Badalamenti*, 237 Mich App at 281, the plaintiff claimed that the defendant cardiologist negligently failed to timely diagnose and treat the plaintiff's cardiogenic shock. The defendants asserted that the plaintiff did not have cardiogenic shock, and that his injuries instead stemmed from an unexpected and rare reaction to a drug, streptokinase. *Id*. at 282. The evidence relevant to whether the plaintiff had cardiogenic shock included *objective* hemodynamic measurements obtained by technical devices: the patient's wedge pressure, cardiac index, and systolic blood pressure. These objective measurements did not support that the plaintiff was in cardiogenic shock. *Id*. at 286-287. The plaintiff's expert witness, Dr. Wohlgelernter, conceded that these measurements were "contrary to a diagnosis of cardiogenic shock." *Id*. at 287. A cardiologist also performed an echocardiogram on the plaintiff, a procedure that includes a physician's interpretation of images on a screen. The echocardiogram demonstrated that the plaintiff's left ventricle was functioning in a nearly normal manner. This evidence, too, supported that the plaintiff was not suffering from cardiogenic shock. *Id*. Dr. Wohlgelernter agreed that the echocardiogram showed that the heart's left ventricle was functioning "fairly well . . . ." *Id*. at 288.

Notwithstanding these concessions, Dr. Wohlgelernter maintained that the plaintiff had cardiogenic shock. According to this Court's opinion, he supported that belief only by expressing "skepticism" of the results of the echocardiogram. *Id*. 287. This Court concluded:

> Dr. Wohlgelernter had no reasonable basis in evidence to support his opinion that plaintiff's left ventricular heart wall function was significantly damaged on March 16, which he agreed was the pertinent time frame and the definitive component for a diagnosis of cardiogenic shock. Rather, as he explained, he based his opinion on his skepticism and disparagement of [the cardiologist's echocardiogram] findings. [*Id*. at 288.]

"Notably," this Court added, "Dr. Wohlgelernter specifically acknowledged that on the basis of the information in the record, a competent cardiologist might logically conclude that plaintiff did not have cardiogenic shock, and he agreed that a reaction to streptokinase could not be ruled out in this case." *Id*. at 289.

*Badalamenti* is a fact-driven case and is easily distinguishable from this one. There, evidence of causation rested largely on objective measurements obtained by machines rather than eyewitness observations.[3] The subjective component of the evidence—a physician's interpretation of the echocardiogram results—did involve a treating cardiologist's impression of what he saw. But Dr. Wohlgelernter agreed that the echocardiogram did not reflect "definite evidence of major damage to plaintiff's heart wall," and supported that the plaintiff's left ventricular systolic function "was fairly well-preserved." *Id*. at 288. Despite these concessions, Dr. Wohlgelernter insisted that the plaintiff had cardiogenic shock, a conclusion he reached by disparaging the cardiologist's interpretation of the echocardiogram. Dr. Wohlgelernter offered no explanation for how or why the cardiologist might have misinterpreted the echocardiogram. Instead, Dr. Wohlgelernter simply stated that the cardiologist who performed the echocardiogram was wrong about the ultimate conclusion.

Unlike the hemodynamic measurements that figured prominently in *Badalamenti*, the evidence supporting that Taylor's bleed came from a diverticulum rather than a biopsied AVM is purely subjective—Dr. Stecevic's interpretation of what he saw. The physician who performed the biopsy—an eyewitness to that procedure—documented in the medical record and testified that he biopsied an AVM. This evidence supplied the facts underpinning Dr. Eisner's testimony. Were we to apply *Badalamenti* in the manner urged by defendants, we might question whether Dr. Stecevic should be permitted to testify that Dr. Sklar did *not* biopsy an AVM, as Dr. Stecevic's testimony contradicts that of an eyewitness to the procedure—Dr. Sklar. But doing so would be error for the same reason that disallowing Dr. Eisner's opinion is improper. Unlike in *Badalamenti*, the experts in this case have formed their opinions based on facts of record, and

---

[3] That is not to say that machines must be considered infallible as a matter of law. What if a living, healthy-appearing patient's temperature measured 115 degrees when taken by a thermometer? It would be entirely proper, from an evidentiary perspective, for an expert witness to question the accuracy of the thermometer. No such question regarding the technology was raised in *Badalamenti*.

have drawn reasonable inferences from the evidence. Their opinions are consistent with the facts and the inferences, and are not grounded in mere speculation or baseless disdain for a contrary conclusion.

Moreover, a powerful strain of precedent is in tension with defendants' interpretation of *Badalamenti*. In *Strach v St John Hosp Corp*, 160 Mich App 251, 271; 408 NW2d 441 (1987) (citation omitted), a medical malpractice case, this Court declared that a jury could disregard a physician's unrebutted testimony, reasoning that "a jury may disbelieve the most positive evidence even when it stands uncontradicted, and the judge cannot take from them their right of judgment." Two additional medical malpractice cases make the same point. In *Ykimoff*, 285 Mich App at 89-90, and *Martin v Ledingham*, 488 Mich 987, 987-988; 791 NW2d 122 (2010), the defendant physicians testified that they would have acted in a certain manner if provided with information about a patient's condition. The Courts held that a jury was entitled to disbelieve the physicians' testimony, even though it was unrebutted by other evidence.

The dissent takes issue with my concurring opinion in *Ykimoff*, despite that I have neither quoted from nor cited it in this opinion. The legal debate between the judges who decided *Ykimoff* centered on the soundness of *Martin v Ledingham*, 282 Mich App 158; 774 NW2d 328 (2009), in which this Court took a position mirroring the dissent's: that a medical malpractice expert cannot contradict an "eyewitness" regarding facts critical to causation. The Supreme Court resolved the debate by adopting the reasoning of my concurring opinion in *Ykimoff* rather than the contrary views of Judges TALBOT and BANDSTRA, holding, "the treating physician's averment that he would have acted in a manner contrary to this standard of care presents a question of fact and an issue of credibility for the jury to resolve." *Martin*, 488 Mich at 988. In *Martin*, the Supreme Court rejected the dissent's remarkable proposition that a fact-finder is duty-bound to accept an uncontroverted fact. A long line of caselaw buttresses the Supreme Court's *Martin* order. See *Rickets v Froehlich*, 218 Mich 459; 188 NW 426 (1922), *Soule v Grimshaw* 266 Mich 117; 253 NW 237 (1934), and *Debano-Griffin v Lake Co*, 493 Mich 167; 828 NW2d 634 (2013), highlighting that when a witness's credibility is at issue, summary disposition is inappropriate.

Here, Dr. Eisner based his opinion that Taylor bled from a biopsied AVM on the operative report signed by Dr. Sklar, and buttressed by Dr. Sklar's deposition testimony that the lesion he biopsied was an AVM. The evidence that Dr. Sklar biopsied an AVM is therefore neither speculative nor conjectural. Dr. Eisner's opinion that Dr. Sklar biopsied an AVM is well grounded in the facts and not the product of mere "skepticism" or disparagement. Similarly, Dr. Eisner's opinion that Taylor's bleeding was likely caused by the biopsied AVMs rests on unchallenged scientific reasoning.

Dr. Stecevic's testimony that a diverticulum was bleeding is subject to challenge for precisely the same reason that a jury may disbelieve that Dr. Sklar biopsied an AVM. Both Drs. Sklar and Stecevic testified to their *perceptions* of visual images; in other words, their opinions about what they had seen. Both are subject to credibility challenges, Dr. Sklar as a defendant, and Dr. Stecevic as a retained expert. Credibility aside, all evidence—even eyewitness testimony—rests on a witness's act of drawing an inference from a perception. Two people can watch a car drive by and give widely divergent estimates of its speed. One might infer that the car is speeding, while the other infers a legal rate of travel. Two physicians can view the same

CT or MRI scan and render divergent opinions about what it reveals, one inferring an abnormality and the other a normal structure. See *Milam v State Farm Mut Auto Ins Co*, 972 F2d 166, 170 (CA 7, 1992) ("All evidence is probabilistic, and therefore uncertain; eyewitness testimony and other forms of 'direct' evidence have no categorical epistemological claim to precedence over circumstantial or even explicitly statistical evidence.").

Dr. Stecevic's disagreement with Dr. Sklar about whether Taylor actually had an AVM highlights the fundamental difference between this case and *Badalamenti*. Here, Dr. Stecevic offered an *opinion* about what Dr. Sklar saw during the first colonoscopy, and what he himself saw during the second. Dr. Stecevic observed an abnormality that he believed to be an actively bleeding diverticulum. No objective evidence *proves* that the lesion was an actively bleeding diverticulum. Similarly, no objective evidence of record proves that the lesions biopsied by Dr. Sklar were AVM's. Rather, both physicians expressed judgments about what they had seen through a colonoscope. Their assessments of what they saw (in Dr. Stecevic's case, under bloody conditions that limited his examination) are not analogous to the unquestioned objective evidence in *Badalamenti* proving that the plaintiff did not have cardiogenic shock. And in that case the experts agreed about the interpretation of even the *subjective* component of the evidence—the echocardiogram.

Here, defendants propose that Dr. Stecevic must be believed. That view flies in the face of basic evidentiary principles. That the physicians involved in this case are professional observers does not change the rule that their eyewitness testimony may be disbelieved by a jury. In *Woodin v Durfee*, 46 Mich 424, 427; 9 NW 457 (1881), our Supreme Court reversed the grant of a verdict directed by the trial court on the basis of "undisputed" evidence that "probably ought to have satisfied any one . . . ." Writing for a unanimous Court, Justice Cooley explained that despite the absence of any conflicting evidence, the jury "may disbelieve the most positive evidence, even when it stands uncontradicted; and the judge cannot take from them their right of judgment." *Id*. Our Supreme Court again emphasized that a witness need not be believed in *Yonkus v McKay*, 186 Mich 203, 210-211; 152 NW 1031 (1915), stating:

> To hold that in all cases when a witness swears to a certain fact the court must instruct the jury to accept that statement as proven, would be to establish a dangerous rule. Witnesses sometimes are mistaken and sometimes unfortunately are wilfully mendacious. The administration of justice does not require the establishment of a rule which compels the jury to accept as absolute verity every uncontradicted statement a witness may make.

See also *Arndt v Grayewski*, 279 Mich 224, 231; 271 NW 740 (1937) (holding that eyewitness testimony "is not conclusive upon the court or a jury if the facts and circumstances of the case are such as irresistibly lead the mind to a different conclusion"). The credibility of eyewitness identification testimony is always a question of fact. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008). "In short, the jury is free to credit or discredit any testimony." *Kelly v Builders Square, Inc*, 465 Mich 29, 39; 632 NW2d 912 (2001).

Our Supreme Court recently acknowledged the authority of medical literature attesting that a physician's misperception of anatomy during surgery is a well-accepted phenomenon. See *Elher v Misra*, 499 Mich 11, 15; 878 NW2d 790 (2016). Physicians may disagree regarding the

interpretation of x-rays, see *Sawka v Prokopowycz*, 104 Mich App 829; 306 NW2d 354 (1981), the conclusions to be drawn from objective and undisputed autopsy findings, see *Robins v Garg*, 276 Mich App 351; 741 NW2d 49 (2007), and the meaning of an EKG tracing, see *Goldberg v Horowitz*, 901 NYS2d 95, 98; 73 AD3d 691 (2010). Dr. Stecevic's perception that he saw a bleeding diverticulum is precisely that, a perception. A jury may believe that the bleeding Dr. Stecevic saw came from a diverticulum, or it may reject that testimony for the reasons expressed by Dr. Eisner.[4]

This case is distinguishable from *Badalamenti* for a second reason. Unlike Dr. Wohlgelernter, Dr. Eisner had a reasonable basis for calling into question the accuracy of Dr. Stecevic's perception that the bleeding was coming from a diverticulum. Here, the evidence supported that (1) Dr. Stecevic's view of Taylor's colon likely was obscured by blood; (2) blood emanating from a source other than a diverticulum may pool in a diverticulum and look like a bleeding diverticulum, (3) diverticular bleeding is rare, and its presence in Mrs. Taylor was coincidental to a procedure that carried a recognized risk of bleeding, and (4) if Dr. Stecevic had successfully stopped the diverticular bleeding as he claimed to have done, Taylor would not have continued to bleed so heavily that a total colectomy was required.[5] Dr. Eisner's opinion that a negligently biopsied AVM caused Taylor's death does not rest on "assumptions" contradicted by "established facts." Nor did Dr. Eisner support his opinions by merely disparaging Dr. Stecevic's "power of observation." Dr. Eisner's causation theory draws upon facts of record and describes a logical sequence of cause and effect.

The dissent posits that because Dr. Stecevic "could not find an active bleed until he reached the hepatic flexure," Taylor was not "actively bleeding from the areas biopsied by Dr. Sklar." And if Taylor was not bleeding from those sites, the dissent reasons, plaintiff "cannot establish that Dr. Sklar's biopsies caused Taylor's death." Respectfully, the dissent's position reinforces the importance of viewing the evidence in the light most favorable to the nonmoving party, and the need to treat Dr. Stecevic's testimony like that of any other witness or eyewitness, i.e., capable of being questioned as to its validity.

That Taylor died due to massive blood loss from her colon is not in dispute. Accepting Dr. Stecevic's claim that the biopsy sites were not bleeding during the colonoscopy and that he successfully stopped the bleed from a diverticulum means that Taylor must have suffered yet another spontaneous, "random" bleed in her colon. As conceptualized by the dissent, Dr. Stecevic's testimony offers no explanation for the source of the bleeding that caused Taylor's death. The only rational conclusion the dissent offers is that Taylor experienced a second, entirely coincidental (and fatal) bleed in her colon.

---

[4] Dr. Stecevic's credibility may also be subject to question based on his status as a paid expert for the defense.

[5] Under defendants' logic, Dr. Stecevic's testimony that he successfully stopped Taylor's bleeding with the epinephrine injection would also have to be believed. This means that there must have been another source of the bleeding that killed Taylor.

-10-

There are obvious gaps in the dissent's one-sided view of the evidence. Dr. Stecevic admitted that Taylor had "massive bleeding" on admission to the hospital and that she bled profusely after the second colonoscopy. He also conceded that the surgery to remove her colon was performed because there "might have been other sources of bleeding." Viewing the evidence in Taylor's favor, a jury would have reason to question Dr. Stecevic's power of observation. If Dr. Stecevic stopped the bleeding from the diverticulum, as he claimed, where did the blood that killed Taylor originate? A jury could reasonably conclude that the "other sources" of the continued, massive bleeding were the sites of the Dr. Sklar's biopsies, as according to Dr. Eisner, biopsying an AVM in a patient on Plavix causes bleeding. That Dr. Stecevic claimed to have "discovered" only one source of bleeding in Taylor's colon during his colonoscopy does not rule out that there were more, given Dr. Stecevic's admissions that his examination was "limited due to [the] large amount of blood in the entire colon" and that he had to end his procedure abruptly because Taylor's blood pressure dropped.[6]

Questions of fact abound in this case. Accordingly, the circuit court did not err by denying defendants' motion for summary disposition.

We affirm and remand for further proceedings. We do not retain jurisdiction.

/s/ Elizabeth L. Gleicher
/s/ Cynthia Diane Stephens

---

[6] In his operative note, Dr. Stecevic noted, "Blood entire examined colon."